193540, Mr. Jordan. Good morning, Your Honors. It pleases the Court, Patrick Jordan, for the appellant, Aloran Yadid. Your Honors, this Court should reverse the summary judgment as to defendant Aloran Yadid, remand the matter to the trial court because it's impossible to establish as a matter of law that Aloran was in control of Orel's PACA trust assets without drawing negative inferences against Aloran. To be individually liable for dissipation of PACA trust assets, there must be no dispute of fact that Aloran had authority to direct control of those assets. While plaintiff insists there's overwhelming evidence in the summary judgment record that Aloran had such authority, it's simply not so. At best, the record presents some undisputed facts that make it possible to draw negative inferences against Aloran, but it's not proper on summary judgment to construe those inferences against him and preclude him of a trial, which is what we're seeking for Aloran. With respect to Aloran's checksigning authority, checksigning authority like ownership or an officer or executive position does not itself establish that Aloran had control over the PACA trust assets. A bookkeeper in some contexts might be an example of someone who may have a position of checksigning authority but without authority to control the account or make decisions on it, and that would be an example of not typically be considered to have control over trust assets, and I don't think it would be something anyone would submit would be liable for a company's debts with a PACA trust claim. This is not controversial. It's borne out in the case law. In fact, even the cases that the district courts cite to for authority on individual liability where there is checksigning authority are distinguishable. Mr. Jordan, this is just Louie. I've got a question about just the procedure and discovery. So, were there any depositions or what discovery was there? Obviously, we've got these affidavits or an affidavit. What else was there? There were no depositions. In fact, it strikes us that appellees in their brief actually point to the fact that they seem to think that it was incumbent for Aloran's defense that he produce an affidavit from his father, Moshe, but we urge that that's not, of course, not the case. Aloran's defense stands on its own, but it seems to beg the question of perhaps they were looking for something that they might have in a deposition of Moshe, but they elected not to receive or seek that deposition testimony. It wasn't incumbent upon us to provide it for them. Their burden on their summary judgment motion was to come forward with sufficient evidence establishing Aloran's control, which they failed to do. What is in the record in the way of the text messages, copies of some checks, about five of, I think, approximately 50 that went out from the company in July of 2018 alone, show various aspects of Aloran's knowledge of the company account, but has set forth in his declaration, he specifically sets forth that to the extent that he was signing any of the checks, these are checks that he was signing at the behest of his father. Document exchange did include copies of those checks, but there were no depositions. Your view is that just the Aloran affidavit can get you past this on the judgment stage? Yes. Just that. Okay. All right. All right. Judge Leval? I have a couple of questions. One is that when $40,000 were transferred into Aloran's personal account, it seems to me there's no doubt that he had total control over those $40,000. At least, even if he didn't have control over more, even if he needed his father's approval to sign checks for more, the transfer of $40,000 to his account gave him complete control over those assets of the company. The second question is that in cooperating in the transfer of those $40,000, he was engaging in a bad faith attempt to surreptitiously evade and defeat the PACA trust liability. Should that account for anything in the question whether summary judgment may be had against him on this question? Yes, Your Honor. Not to the extent about summary judgment at this point being entered against him. We would acknowledge that once the funds were in his account, his personal account, he certainly had control over those funds. But in the absence of any other undisputed fact establishing that he had control over the PACA trust asset, that would merely make him a third-party transferee of those $40,000 and wouldn't in any way make it retroactively any more or less true that he was in control of the PACA trust asset. He became in control of the $40,000 when it hits his account. Now, he explains that the transfer into the account doesn't establish that he had control over the PACA trust assets because as it was in control of Orel and sent out at the direction of Moses to his certainly once it's in his account, it is in his control. He does say he didn't receive a personal benefit out of it. So, I think that and in fact goes further to say that he still owns some money for salary by the company. So, I think that undercuts a little bit of his bad intentions as to it. But to the extent he became a third-party transferee, we would submit that his liability to that extent would be more similar to something like what the court examined in American Banana Co. versus Republican National Bank. My understanding or at least a possible understanding with respect to those $40,000 is not that they became his when they were transferred his account, but that they continue to be PACA trust assets. They'd simply been placed surreptitiously in order to deceive in his account. They still continue to be the assets of the company, but moved to his account in order to hide them from creditors. So, with knowledge. So, in having total control over those assets, he was exercising total control over at least a part of the PACA trust. But then there's the second part of my question is whether his participation in that surreptitious evasion and effort to defeat PACA trust liability is something that should either by estoppel or in some manner justify the conclusion that he's liable. Your Honor, I think we would concede that as a third-party transferee, he would be liable for a disgorgement of that amount of the PACA trust assets of the $40,000. Potentially, the other elements of liability for a third-party transferee were met. But the disgorgement claim isn't what's pled or sought for by the plaintiff. So, we would submit to that extent that they're arguing he's liable for the $40,000 as a result of liability of the transferee on the disgorgement. That should be dealt with on remand. Whether or not it reflects a participation scheme to avoid the PACA trust liability, I think that would go too far in the characterization of the facts or draw too many inferences where Elrond explains that the money is transferred to his account essentially at the direction of Moshe in control of the company does, we would say, of the PACA trust assets. And then, they're further dispersed not for Elrond's personal gain or in any way that would, there's nothing in the record establishing that he used them for his own personal benefit, but rather that he continued to disperse them at the direction of Moshe. That's exactly my point, that this is not a circumstance where the PACA trust assets were then transferred improperly to a third person as a kind of a preferential transfer, where that transfer resulted in the assets becoming the assets of the third person and no longer a PACA trust asset. They continue to be under the control of Moshe. They continue to be part of the company's assets, but just part for convenience and for subterfuge to hide them in your client's account. Potentially, yes, to the extent that they were directed there by Moshe. If Moshe had nefarious intent in transferring them out into Elrond's account, and I don't think there's any issue as to the fact that they are PACA trust assets and that Elrond seems to have had control over his own bank account, there wouldn't, I think, be much merit to saying he doesn't have control over his own personal checking account. But if he didn't have overall liability on the PACA trust claim, then he's only liable to them to the extent he's a third-party transferee for a disgorgement, which may be so, even if they were dispersed out at the direction of Moshe. We would agree with you on no less PACA trust asset, but the third-party transferee liability in the cases that deal with that would limit his liability to the amount of disgorgement. And as a procedural matter here, that's not pled or what was before the court on summary judgment. It was whether or not at large... Judge Kearse, do you have any questions? Yeah, I have a question. Sorry. You may have already answered this, but is there an affidavit or a declaration in the record from Elrond's father? No, there's not, Your Honor. Appellees do raise this in their brief, but we insist that our defense and Elrond's defense is completely independent, stands on its own from anything that Moshe would provide. In fact, to the extent that it seems that if one were submitted, they would have then attacked that as being self-serving. But it's not for Elrond to come forward, at least on summary judgment, and disprove as a matter of fact that he was or wasn't in control and produced these. It's whether or not plaintiffs met their summary judgment. And there are some inferences that some of these facts may create that may suggest the possibility of control, but there's, especially in the text message correspondence where Gary Allen's insisting that upon meeting with a defendant that Elrond come with his father. Does your father have collateral? Your father must be here when we meet. Inferences can be drawn the other way. So we think that the only way the court could arrive at the conclusion it did below is if they draw these inferences from the text messages, which really could be drawn either way, but they draw them against Elrond. So, Mr. Jordan, you reserve a minute for rebuttal or hear from the other side. Mr. Brown. Thank you, Your Honors, and good morning. May it please the court, my name is Greg Brown, and I represent the appellees S. Katzmann Produce Inc. and Katzmann Berry Corp. I think the court has presciently asked two key questions of appellant's counsel, specifically with regard to the $40,000 that was transferred. And the key point in that transfer of $40,000 is not that Mr. Yadid was a third-party transferee of those funds, and there's a whole body of case law that discusses the liability of third-party transferees, which are generally, for example, banks. And the Second Circuit case of E.R. Mata is on point with regard to what must be shown for a third-party transferee to have liability. What's not required there is participation by the third-party transferee, and that's what we have here, and that's why we rely in our brief on Section 326 of the Restatement, which contemplates that if an individual, a third-party even, has knowledge that funds are being transferred in breach of the packet trust or any trust, and they participate in the breach of that trust, then that individual can have liability not only for the funds that were transferred, but for the full damages sustained by the trust beneficiaries. And in this instance, we have the appellant participating in the transfer of these funds as the company is winding down. And as I can get into later, we know that Eliran knew what was in the bank account. He provided instructions to Katzmann about when checks should be deposited, when checks should be withheld, and so he knew what was in the account. He knew what was there. He knew as this business was winding down that this $40,000 was basically what was left in the account, and by secreting it, by transferring it to his personal account, he would frustrate the lawsuit that he knew was coming. And so he participated with his father in secreting this. Mr. Brown, I think you've made an excellent jury address, but what I'm looking at is the affidavit of declaration from Eliran, where he describes at A131, he describes the account, he describes, and I don't have to repeat it, but he describes why it was set up, that it was not his own, that it was as a result of the fact that his father, Moshe, did not have his own bank account and so on. And so he disputes the inferences that I think you are drawing, he also disputes some of the facts. What do we make of this affidavit? Well, Your Honor, I think the affidavit is, it's conclusory, it's self-serving, and it's unsupported by admissible evidence. So affidavits are, by nature, at least in my view, self-serving at some level. And I'm not sure that, what is conclusory about particularly 45 to 49? With regard to paragraphs 45 and 49, I would say that he has statements, for example, and these are true throughout the declaration, that his father told him how the funds or how he should comport himself when acting on behalf of the company. There's no evidence that supports that. And the Second Circuit has said that the declaration, the conclusory declaration, needs to be supported by hard evidence. Now, plaintiff was the movant in this case, and they submitted 15 indicia of what they believe is control exercised by Eliron over packet trust assets. Once they did that, the burden shifted to the appellant to submit proof that he was not in a position of control. What he could have done was he could have submitted text messages or emails from his father which show that, yes, my father told me to transfer this $40,000 into my personal account. He didn't do that. We don't have a declaration from Moshe which says, I always instructed Eliron. Why didn't you seek a deposition? Your Honor, we had 15 indicia of control by Eliron. And it's not just the $40,000. And I can where there are 15 different indicia. He had a new check signing authority. He authorized the withdrawal from Oral's bank account. He authorized electronic transfers of funds from Oral's bank account. He signed a truck lease as owner of the business. And then he personally guaranteed that truck lease. So it's not just the $40,000. But if you look at the totality of the 15 different elements that we had when we made this motion, which the court agreed constituted overwhelming evidence of Pellon's liability under PACA, we thought that there was no need for further deposition. Judge LaValle, do you have any questions? No, thank you. Judge Keirs? No further questions. Mr. Gron, you still have some time left. Please proceed. Thank you, Your Honor. So we think that the record as the district court concluded shows overwhelming control of PACA trust assets in Eliron's position. And I'd also like to just briefly address the issue of whether or not, because this court hasn't previously held, whether or not an individual who is not an officer or director of a company can be held, or a shareholder, can be held liable under PACA. And the Third Circuit has concluded that an individual who has a position of control over PACA trust assets can, in fact, be held liable under PACA. And many district courts in the circuit have followed the reasoning of the Third Circuit in Bear Mountain against Mitch Kim. And we would encourage this court to do the same. We think this case is distinguishable, however, from a case like Mitch Kim, where the individual who, there were two individuals in a position of control of PACA trust assets. The other was a part-time employee who worked two to three days a week on a part-time basis. And although that person had check signing authority, they basically issued payments to the creditors of the business in the ordinary course of business. We think in this case, when you have the 15 addition of control, including personally guaranteeing the debts of the company, holding himself where the appellant has held himself out as an owner, and transferred $40,000 to his personal bank account, clearly outside of the ordinary course of business, and clearly done in a way to hinder plaintiff's collection efforts, that that distinguishes Mr. Yadid's conduct from the defendant in the Mitch Kim case. Thank you very much. Mr. Jordan. I do have one. I do have a question.  Judge LaValle here. Reading from your brief on page 18, I think it's on page 18, section 326 of the restatement, you say is particularly relevant. And you quoted as saying that a third person, this is all in quotes, a third person who, although not of trust property, has noticed that the trustee is committing a breach of trust and participates therein is liable to the beneficiary for any loss caused by the breach of trust. Well, if that's applicable to him, I'm not sure it is applicable to him because it includes that phrase, although not a transferee. And in this case, he, in his participation in the breach of trust was the transferee. But in any event, even if it is applicable to him, notwithstanding that he is the transferee, it says that he's liable for any loss caused by the breach of trust. And in this case, the breach of trust was the Trampelson-Dollars. So I'm not sure I understand how that provision gets you from a liability for $40,000 to a liability for $500,000. Sure. Let me address, there are two points I think that you've raised. The first is whether or not Eleron was a transferee. And I don't think he was in the ultimate sense. I think as the court previously discussed, he received PACA trust assets, but they were still, I think the language used was the property of Or-El. He was only a simulated transferee because it remained the assets of Or-El and they were placed in his account just for hiding purposes. Well, all right. So if I grant that, but what about the second question? Why does this provision not make him liable for $40,000? It makes him liable for $40,000 without questioning, but how does it make him liable for $500,000? This was a breach that resulted in basically the clearing of the funds from Or-El's bank accounts. And Or-El effectively made itself judgment proof, resulting in plaintiff's inability to collect any portion of the judgment that was ultimately entered in this case. And so if you look at cases, for example, like S&K Sales Co. against Nike, which is the second circuit case from 1987, what, and even if you look at the notes in the restatement, the comments of the restatement, what you find is the liability is not just limited to the funds themselves that were transferred, but to the full amount of the damages that the breach caused. And so here, yes, it was only $40,000 that were transferred, but it was the participation in the breach, not just the $40,000, but everything prior to that too. Again, we submit that Eliron's control wasn't manifest just with this transfer of $40,000, but all of his conduct prior, those transfers, plus the $40,000 with the intent to defraud the plaintiff, that all contributes to his liability. Eliron knew for months... Could you specify what were the previous actions of Eliron that came within this provision as to, that were breaches of the trust? Sure. Eliron, for example, withdrew cash from the bank account. And so we don't know what he ultimately did with those, but we know he withdrew, on a couple of instances, cash from the bank, from the account. He made payments to creditors outside of the ordinary course of business when he exercised his checksigning authority. If you look at the bank statements that were submitted in the record, let me see. If you look at the statements that were submitted in the record, you could see that basically the account was used for personal purposes. There were charges to home goods stores and to clothing stores and to restaurants. So this was a continuing breach. For months prior to the lawsuit, Eliron knew that the company had financial difficulty, was really struggling to pay its suppliers, and nevertheless continued in this conduct of breaching the package trust. Mr. LaValle, in this case, do you have any further questions? No further questions here. None from me, thank you. Mr. Jordan, you have one minute for rebuttal. Yes, Your Honors. We insist that all of Eliron's conduct merely reflects that there is an issue of fact as to whether or not he was in control of these MACA assets at any time. It can't be concluded without drawing negative influences against him. From the record, the 15 indicia that appellees insist upon get them in no better place. His knowledge of when checks were deposited or which checks should be cashed and for how much are all just ways of interpreting the text messages and drawing an influence from them. In fact, text messages also reveal that there was an agreement as to the time frame and when and what checks were going to be cashed. That was entered into exclusively, apparently, between Gary Allen, the plaintiff, and his father that he didn't even know about, which I think puts in stark contrast to the fact that it was not really Eliron who was in control of the company. It was when times started getting tough. That's when they started insisting on seeing Moshe at the meetings and asking whether Moshe had collateral to put up. The cases, including Bear Mountain, don't come to a different conclusion. In fact, Bear Mountain summary judgment, there was a denial of summary judgment in Bear Mountain, and that went to trial. And that's what we're asking for here for Eliron. Inferences may be drawn against him on some of these issues, but that is for a jury, and he's entitled to have the jury decide those issues again. Thank you very much. Thank you very much. World Reserve decision.